**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

MONICA D. STEVENS,                     :          Case No. 5:12-CV-1030

                Plaintiff,          :

v.                                     :          **MEMORANDUM DECISION
                                                  AND ORDER**

COMMISSIONER OF SOCIAL SECURITY, :

                Defendant.          :

      Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying her claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the Act.  Pending are the cross-Briefs of the Parties (Docket Nos. 15 & 16).  For the reasons that follow, the undersigned Magistrate Judge affirms the Commissioner's decision.

**I. PROCEDURAL BACKGROUND.**

      On May 21, 2009, Plaintiff filed applications for DIB and SSI alleging that she became unable to work because of her disabling condition on January 31, 2007 (Docket No. 11, pp. 154-155; 158-163 of 442).  Plaintiff's requests for DIB and SSI were denied initially and upon reconsideration (Docket No. 13, pp. 84-86, 87-89, 92-93, 94-96 of 442).  Plaintiff filed a timely request for hearing and on

June 10, 2010, Administrative Law Judge (ALJ) Penny Loucas held a hearing at which Plaintiff, her counsel, and Vocational Expert (VE) Larry Tokey appeared (Docket No. 11, pp. 11-59 of 442).  On October 25, 2010, ALJ Loucas issued an unfavorable decision (Docket No. 11, pp. 67-79 of 442).  On April 3, 2012, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp. 5-7 of 442).  Plaintiff filed a timely Complaint in this Court seeking judicial review.

## II. THE ADMINISTRATIVE HEARING.

The ALJ conducted the administrative hearing by video teleconference from Springfield, Massachusetts.  Plaintiff appeared at counsel's office in Ohio.  She and the VE testified (Docket No. 11, p. 13 of 442).

### A.  PLAINTIFF'S TESTIMONY.THANKS

At age 16, Plaintiff ran away from home, stole a car, picked up two friends and drove to Lexington, Ohio.  To elude capture by the State Highway Patrol, Plaintiff sped off, driving 90 miles per hour, lost control of the car, hit a guard rail and then a tree.  Her two friends died from the injuries sustained in the accident.  Plaintiff claimed that she was not under the influence of drugs or alcohol at the time to the accident and she had not used drugs since her incarceration and release from the Department of Youth Services in 2001 (Docket No. 11, pp. 26, 33, 36 of 442).

Plaintiff was diagnosed with depression, anxiety, a bipolar disorder and a personality disorder. She had symptoms of uncontrollable outbreaks of violence, constant fear, episodic crying, temper tantrums, auditory hallucinations, temporary agoraphobia, dyspnea, social phobia and depleted motivation, Plaintiff was unable to pinpoint the causes for such behaviors or what triggered the onset. Her symptoms fluctuated and her treating physicians were looking for a medication or combination

of medications to moderate her symptoms.  Weaned from Citalopram, an antidepressant and prescribed Cymbalta®, a medication used to treat depression, Plaintiff took Lithium and Chlorpromazine, a medication designed to treat psychotic disorders.  The dosage of Lithium was increased, in part, to assist with eliminating the auditory hallucinations of friends who did not survive the automobile accident (Docket No. 11, pp. 34, 37, 38, 39, 46-47 of 442).

She has undergone counseling for approximately one year and seen little improvement. Plaintiff acknowledged that she had some responsibility to heal herself despite the current counselor's failure's at being assertive.  Plaintiff was offered group therapy but she did not accept the offer because she did not generally trust people and she did perform well in public settings.  Having never been offered anger management therapy, Plaintiff elected to attend only if there were individual counseling sessions (Docket No. 11, pp. 43-45 of 442).

Plaintiff was twice employed at Burger King®.  First, for roughly two months in 2001, Plaintiff was a full time employee who assembled sandwiches and other orders.  She was not proficient at performing her job responsibilities and she "messed up a lot."  Her work record showed that she was absent at least twice weekly and she was given a written reprimand.  Because of symptoms related to depression and anxiety, Plaintiff quit this job.  Second, Plaintiff was employed at the same Burger King®, until she lashed out and screamed at someone (Docket No. 11, pp. 23-24, 39-40 of 442).

To the best of her recollection, in 2001 and 2002, Plaintiff was employed at Kwik Fill/Quick Lube s a gas station attendant.  She actually pumped gas for  customers during a period of two months.  Plaintiff was not proficient at using mathematical skills to consummate the sales so she quit this job before her employer exercised the option to fire her (Docket No. 11, pp. 24-25, 26 of 442).

3

In 2003, Plaintiff worked at Qualiform, a custom rubber molding factory, for three months. She trimmed rubber parts.  Overwhelmed by the amount of work required, Plaintiff quit because she was unable to maintain the pace (Docket No. 11, pp. 27-28 of 442).

Plaintiff was employed at Walmart in 2004 for four to five months as a cashier.  Her lack of math skills created problems with shortages and she was considered too slow to bag items.  Not only were her supervisors unhappy with her performance, the customers complained as well.  She was absent from work at least four to five times monthly.  Plaintiff received two written reprimands.  She quit to avoid being fired (Docket No. 11, pp. 29, 30, 31, 32 of 442).

Plaintiff delivered newspapers in 2004 for the Daily Record.  Unable to remember which households were entitled to a delivery and unable to deliver the papers in a timely manner, Plaintiff was absent at least fifteen times during the two months that she was employed.  She quit this job (Docket No. 11, pp. 30-31 of 442).

Employed at McDonalds making sandwiches, Plaintiff quit the job because of depression and an overall inability to become motivated to go to work (Docket No. 11, p. 33 of 442).

**B.      VE TESTIMONY.**

Describing himself as a vocational case manager, the VE described his job responsibilities as assessing an individual's ability to work through a variety of testing and inventories, vocational counseling and assisting people to find jobs (Docket No. 11, pp. 49-50 of 442).  Averring that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), the VE explained that Plaintiff had no past work that met the substantial gainful activity threshold (Docket No. 11, p. 52 of 442).

4

In the first hypothetical, based in part on Exhibit 4F[1], the ALJ posed the following:

1.    No physical impairments; just mental impairments.
2     Limited to simple and detailed instructions constantly and rarely any complex instructions.
3.    Able to concentrate for up to two hours at a time with normal breaks.
4.    No interactions with the general public and no limits on interactions with supervisors and co-workers.
5.    Limited to simple and routine changes in the work environment.
6.    Limited by the intellectual capacity that is an Intelligence Quotient (IQ) of 74 which places the claimant in the borderline range of intellectual functioning.

The VE responded that this hypothetical plaintiff could perform medium duty work at the exertional level jobs described below:

| Job & DOT Number | Specific Vocational Preparation | Number of jobs |
|---|---|---|
| Hand Packager 920.587-018 | The amount of lapsed time required by a typical worker to learn the techniques, acquire information and develop the facility needed for average performance of this job is anything beyond a short demonstration, up to and including one month. | 48,000 in the State of Ohio and 798,000 in the United States economy. |
| Laundry Worker 361.684-014 | The amount of lapsed time required by a typical worker to learn the techniques, acquire information and develop the facility needed for average performance of this job is anything beyond a short demonstration, up to and including one month. | 8,000 in the State of Ohio and 218,000 in the United States economy. |
| Cleaner II (a cleaner of planes, cars and buses) 919.687-014 | The amount of lapsed time required by a typical worker to learn the techniques, acquire information and develop the facility needed for average performance of this job is a short demonstration only. | 12,000 in the State of Ohio and 336,000 in the United States economy. |

(Docket No. 11, p. 53 of 442).

In the second hypothetical question, the ALJ asked whether any of the aforementioned jobs required mathematical skills beyond what is commiserate with an IQ of 74.  The VE responded that

---

[1]

Exhibit 4F is the psychological evaluation of Dr. Robert F. Dallara, Jr., Ph.D., conducted on August 25, 2009 at the request of the Bureau of Disability Determination.

simple counting skills were required for the laundry worker and the hand packager but nothing that would exceed simple addition and subtraction (Docket No. 11, p. 53 of 442).

The third hypothetical question including the following limitations:

1.    Limited production, no rate paced type work on the production assemble line.
2.    More goal oriented type jobs.

The VE explained that the laundry worker job as well as the hand packager jobs would be eliminated because they would entail some production accountability.  However, the following medium duty exertional level jobs would be added to the list of jobs that Plaintiff can perform given these limitations:

| JOB & DOT | SVP | SKILL LEVEL | NUMBER OF JOBS |
|---|---|---|---|
| Garden worker 406.684-018 | The amount of lapsed time required by a typical worker to learn the techniques, acquire information and develop the facility needed for average performance of this job is anything over one month up to and including three months. | Semi-skilled work is work that needs some skills but does not require doing more complex work duties. 20 C. F. R. §§ 404.1568(b), 416.968(b). | 1,300 in the State of Ohio > 18,000 in the United States economy. |
| Industrial cleaner 381.687-018 | The amount of lapsed time required by a typical worker to learn the techniques, acquire information and develop the facility needed for average performance of this job is anything beyond a short demonstration, up to and including one month. | Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  20 C. F. R. §§ 04.1568(a), 416.968(a). | 86,000 in the State of Ohio > 2 million in the United States economy. |

Since all three jobs–the cleaner job, the garden worker and the industrial cleaner–are performed individually and typically there is only one person per shift there would be no co-workers and supervision would be available only as necessary to stay on task.  If the hypothetical plaintiff were "off task" up to one third of the time, there would be no work available (Docket No. 11, pp. 54, 55 of 442).

### III. SCHOOL RECORDS.

Plaintiff was an average student in the ninth grade, obtaining virtually all "Cs" in language arts, math, social studies and Occupational Work Adjustment (OWA) program and OWA work study, a course of study used in high schools for the purpose of developing young workers, their competencies, attitudes and behaviors critical to successful employment (Docket No. 11, pp. 228 of 442; www.pdfio.com).

### IV.  MEDICAL EVIDENCE.

The cornerstone for the determination of disability under both Title II and Title XVI is the medical evidence.  Each person who files a disability claim is responsible for providing medical evidence from sources who have treated or evaluated the claimant, determined that the impairment exists and assessed the severity of that impairment.  20 C. F. R. § 404.1512((b), (c) (Thomson Reuters 2012).  A chronological review of those sources who treated, counseled or otherwise evaluated Plaintiff follows.

    1.    **WADSWORTH-RITTMAN HOSPITAL, EMERGENCY ROOM**.

| | |
|---|---|
| March 16, 2008 | Plaintiff was treated for dysfunctional uterine bleeding.  Her complete blood count was normal and there was no evidence of anemia.  The symptoms were treated with a 10-day prescription of progesterone (Docket No. 11, pp. 243-244 of 442). |
| February 22, 2009 | Plaintiff was treated for abdominal pain which had been worsening for a couple of days.  Diagnosed with a vomiting illness, hydration therapy was used to restore the fluids and electrolytes in the body.  The admitting physician, Dr. Kevin D. Markowski, M. D., considered Plaintiff obese (Docket No. 11, pp. 240-241 of 442). |
| April 21, 2009 | Plaintiff was treated for abdominal pain after eating at Taco Bell.  She was diagnosed with food poisoning and possible gastroenteritis and gastritis (Docket No. 11, pp. 238-239 of 442). |
| May 21, 2009 | Plaintiff was treated for nausea, vomiting, weakness and diarrhea.  Diagnosed with gastroenteritis by history and mild dehydration, hydration therapy was administered intravenously and Plaintiff was provided a medication designed to treat motion sickness and nausea (Docket No. 11, pp. 236-237 of 442). |

    2.    **DR. DALE C. ANGERMAN, M. D**.

7

| | |
|---|---|
| June 5, 2009 | Plaintiff presented with abdominal pain.  Numerous tests were administered; the results showed no fibroids or ovarian cysts.  Dr. Angerman suspected that Plaintiff had pelvic inflammatory disease (PID).  Plaintiff weighed 247 pounds and Dr. Angerman considered her obese (Docket No. 11, pp. 244-251 of 442). |
| June 13, 2009 | Suspecting that the pelvic pain was a mild case of PID, chemical tests were ordered.  There was evidence of an abnormal liver function study.  Plaintiff weighed 246 pounds (Docket No. 11, pp. 428, 429 of 442). |
| June 23, 2009 | Results from an enhanced examination of the lung and liver were unremarkable (Docket No. 11, p. 439 of 442). |
| March 15, 2010 | Plaintiff had difficult or labored respiration and pain over her rib and flank area.  Upon completion of diagnostic tests, Plaintiff was diagnosed with mild enlarged heart.  Weighing 248 pounds, Plaintiff was encouraged to attempt to improve her diet and exercise patterns to aid in medical management of these problems (Docket No. 11, pp. 403, 405, 409-412 of 442). |
| March 17, 2010 | The echocardiogram confirmed the presence of an enlarged heart (Docket No. 11, p. 408 of 442). |
| March 26, 2010 | Follow up to chest X-ray showed no pain and the shortness of breath was better.  Weighing 248 pounds, Plaintiff reported that she was exercising to help lose weight.  Dr. Angerman noted that Plaintiff was well appearing, in no acute distress, alert but obese (Docket No. 11, pp. 402, 403, 406 of 442). |

3.    THE COUNSELING CENTER

Apparently, this center provides a comprehensive range of outpatient, rehabilitation/recovery and psychiatric services designed to meet the needs of the individual and/or their family members.

Plaintiff underwent counseling and psychiatric evaluations which are highlighted here.

| | |
|---|---|
| June 10, 2009 | Plaintiff presented with a general inability to remember happiness and she saw no way out.  A complete social, medical and employment history was taken.  Plaintiff had been the victim of domestic violence and sexual abuse.  Diagnosed with a bipolar disorder, depression with psychotic features, crisis intervention made contact with Plaintiff regarding her safety.  The licensed social worker attributed a Global Assessment of Functioning, a numeric score used by clinicians to subjectively rate occupational social and psychological functioning, that suggested the presence of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)  or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job (Docket No. 11, pp. 258-266, 275-276 of 442; www.psyweb.com/DSM_IV/jsp/Asix_V.jsp). |
| June 15, 2009 | Jeanne Miller, MSPC, worked to establish a therapeutic relationship, attempted to educate Plaintiff on feeling safe in a relationship after her boyfriend brandished a gun at her head.  Plaintiff declined immediate help from the women's shelter and was working on being able to leave her boyfriend |

8

|  | (Docket No. 11, p. 274 of 442). |
|---|---|
| June 25, 2009 | After conducting a comprehensive psychiatric review which included psychiatric stressors emanating from the accident and the sexual abuse, Dr. Nukala Reddy, M. D., a psychiatrist, approved an individual service plan for Plaintiff to undergo treatment with a counselor regularly, with an emphasis on learning how to control anger, deal with the past and stop suicidal thoughts Dr. Reddy made a passing remark that Plaintiff was obese (Docket No. 11, pp. 267-269, 271- 273of 442). |
| June 29, 2009 | During an hour session, Plaintiff vented about her aunt having bypass surgery and her fears.  Her level of participation in the counseling was very good and there was mild evidence of depression and anxiety.  A handout that discussed post-traumatic stress syndrome was reviewed.  She represented that some issues with her mother had been resolved (Docket No. 11, p. 270 of 442). |
| July 16, 2009 | Plaintiff was "pretty good" although she had the same nightmare eight times.  She was going to monitor whether the symptoms were worse than the nightmares so that changes in her medication could be made (Docket No. 11, p. 308 of 442). |
| July 23, 2009 | Plaintiff reported having auditory hallucinations of the people who died in the accident.  She also had difficulty falling asleep.  Ativan was prescribed to decrease anxiety (Docket No. 11, p. 307 of 442). |
| August 12, 2009 | Plaintiff reported that "today's better than most" (Docket No. 11, p. 305 of 442). |
| August 20, 2009 | Plaintiff claimed that the Ativan caused racing thoughts so she requested a return to Chlorpromazine (Docket No. 11, p. 304 of 442). |
| September 3, 2009 | Plaintiff had improved her ability to control her anger (Docket No. 11, p. 291 of 442). |
| September 18, 2009 | Plaintiff moved in with her boyfriend and was using the tools acquired to control her anger when dealing with her boyfriend's mother (Docket No. 11, p. 301 of 442). |
| October 6, 2009 | Plaintiff discussed her grief over the accidental death of a family member.  The clinician assisted Plaintiff with improving her ability to control anger (Docket No. 11, p. 298 of 442). |
| October 15, 2009 | Depressed by the deaths in her family, Plaintiff was having auditory hallucinations (Docket No. 11, p. 297 of 442). |
| November 12, 2009 | Plaintiff reported that being on Lithium resulted in a "world of change."  She was coherent and relevant, pleasant to anxious and cooperative.  There were no hallucinations, delusions or suicidal ideations (Docket No. 11, p. 294 of 442). |
| December 9, 2009 | Plaintiff talked about her current struggles involving her niece. She acknowledged that she needed to improve her coping skills (Docket No. 11, p. 340 of 442). |
| December 23, 2009 | Plaintiff discussed the sexual abuse by her biological father. She was receptive to learning coping skills (Docket No. 11, p. 336 of 442). |
| January 27, 2010 | Plaintiff reported doing well (Docket No. 11, p. 335 of 442). |
| February 25, 2010 | Plaintiff discontinued her medication for 1½ months because she lacked |

9

|                | finances.  Her mother purchased her medication and she was now coherent, relevant, pleasant to anxious and cooperative.  She did not have any suicidal ideations or hallucinations (Docket No. 11, pp. 331, 332 of 442). |
|----------------|----------------|
| March 10, 2010 | Plaintiff was doing fairly well.  Having been medication compliant, it was recommended that she continue counseling (Docket No. 11, p. 328 of 442). |
| April 13, 2010 | Plaintiff appeared to be medication compliant.  She was able to discuss her sexual abuse (Docket No. 11, p. 386 of 442). |
| April 19, 2010 | Plaintiff was not medication compliant because she could not afford it.  Community sources were contacted to get her medications and to assist with moving from her boyfriend's home (Docket No. 11, p. 397 of 442). |
| April 21, 2010 | Plaintiff reported that her boyfriend was abusive.  She had also not been medication compliant (Docket No. 11, p. 395 of 442). |
| April 28, 2010 | Plaintiff discussed her daily stressors.  She declined an offer to attend group sessions.  She reported that her condition had improved when she got back on her medications (Docket No. 11, pp. 393, 394 of 442). |
| May 17, 2010   | Plaintiff was medication compliant (Docket No. 11, p. 390 of 442). |
| May 26, 2010   | Plaintiff was seen to discuss concerns about the upcoming administrative hearing (Docket No. 11, p. 387 of 442). |

4.    **DR. ROBERT F. DALLARA, JR., PH.D., PSYCHOLOGIST.**

The Bureau of Disability Determination (BDD) requested a psychological assessment.  A clinical examination was conducted on August 25, 2009, during which no diagnostic tests were administered.  At that time Plaintiff stated that she weighed 254 pounds (Docket No. 11, p. 278 of 442).

Diagnosing Plaintiff with a mood disorder, not otherwise specified, Dr. Dallara attributed a GAF of 55 or moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers).  It was his opinion that Plaintiff's ability to:

(1)    relate to others was at least mildly impaired as a result of her mood difficulties;

(2)    understand instructions did not appear to be impaired while her ability to remember and carry out simple one or two-step instructions may be mildly impaired;

(3)    maintain attention and concentration did not appear to be impaired during the examination; and

(4)    withstand stress and pressure associated with the day to day work activity appeared to be mildly impaired as a result of her mood difficulties.

10

There was no evidence during the clinical examination to suggest impairment to persistence or pace (Docket No. 11, pp. 278-281 of 442).

     5.     **DR. JOHN A. COMLEY, PH. D., A CLINICAL PSYCHOLOGIST.**

Plaintiff was referred by Geof Ketler of Job and Family Services to Dr. Comley, with the request to provide a disability assessment to clarify the nature of Plaintiff's psychological problems, to establish a diagnosis, to develop recommendations for treatment and to ascertain if Plaintiff was psychologically able to work.  On September 29, 2009, Dr. Comley conducted a clinical interview, mental status examination and the administration of the Wechsler Adult Intelligence Scale, Third Edition (WAIS) and the Millon Clinical Multiaxial Inventory II (MCMI-II) (Docket No. 112, p. 284 of 442).  He completed the analysis with a MENTAL FUNCTIONAL CAPACITY ASSESSMENT (Docket No. 11, p. 383 of 442).

     A.     **NATURE OF PLAINTIFF'S PSYCHOLOGICAL PROBLEMS.**

Plaintiff was experiencing the combination of mood disorder, some psychotic thinking and significant personality problems, with a depressed mood, an acting out propensity, some clear antisocial tendencies, a number of schizoid traits and significant anger and splitting processes with marginal ego strength (Docket No. 11, p. 288 of 442).

     B.     **THE DIAGNOSIS.**

Using the five axis model designed to provide a comprehensive diagnosis that includes a complete picture of acute symptoms and the entire scope of factors that account for a patient's mental health, Dr. Comley made the following determinations:

| | |
|---|---|
| Axis I | Polysubstance dependence. |
| | Bipolar I Disorder, most recent episode depressed |
| Axis II | Borderline Personality Disorder |
| Axis III | None reported, old concussion |
| Axis IV | Issues with the family |

Axis V        GAF (current) of 49, which means that there are serious symptoms or any serious impairment in social, occupational, or school functioning (Docket No. 11, p. 288 of 442; www.psyweb.com/DSM_IV/jsp/Axis_I.jsp).

**C.      RECOMMENDATIONS FOR TREATMENT**

Psychological treatment was recommended on an outpatient setting using the didactic approach in individual psychotherapy.  Dr. Comley also recommended that Plaintiff should receive a psychiatric evaluation.

**D.      CAN PLAINTIFF WORK?**

Plaintiff should be considered psychologically disabled (Docket No. 11, pp. 288, 289 of 442).

**E.      THE WAIS.**

This test measures intelligence in adults.  On a partial administration of the WAIS-III, Plaintiff's verbal score placed her within the borderline range of intellectual functioning.  The examiner opined that the test results were somewhat low because of interference from nonintellectual factors.  The score on the verbal comprehension was indicative of very low functioning (Docket No. 11, pp. 287, 289 of 442).

**F.      THE MCMI-II.**

This tool is intended to provide information on personality disorders, aptitudes and interests.  The results, however, were only marginally valid as Plaintiff tended to exaggerate her problems (Docket No. 11, p. 286 of 442; http://medical-dictionary.thefree dictionary.com).

**F.      MENTAL FUNCTIONAL CAPACITY ASSESSMENT.**

Dr. Comley assessed Plaintiff's abilities in the general categories of understanding and memory, social interaction and adaptation.  It was his opinion that Plaintiff was markedly limited in the ability to:

1.      Work in coordination with or proximity to others without being distracted by them.
2.      Complete a normal workday and workweek without interruptions from

12

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

3. Accept instructions and respond appropriately to criticism from supervisors.

4. Get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

(Docket No. 11, p. 383 of 442).

**6.** **PSYCHIATRIC REVIEW TECHNIQUE**

For the period of May 21, 2009 through June 8, 2009, Dr. William Benninger, Ph. D., diagnosed Plaintiff with a mood disorder. The impairment was not severe. He indicated the degree of functional limitations that existed as a result of Plaintiff's impairment:

| FUNCTIONAL LIMITATION | DEGREE OF LIMITATION |
| --- | --- |
| Restriction of Activities of Daily Living | Mild |
| Difficulties in maintaining social functioning | Mild |
| Difficulties in maintaining concentration, persistence or pace | Mild |
| Episodes of decompensation, each of extended Duration. | None |

Weight was given to the examining source statements of functioning as they were consistent with clinical and activities of daily living evidence on file. Dr. Benninger found Plaintiff's allegations partially credible (Docket No. 11, pp. 311-323 of 442).

**IV. STEPS TO SHOWING ENTITLEMENT TO SOCIAL SECURITY BENEFITS.**

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); See also 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a)

(same definition used in the SSI context)).  The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively.  To assist clarity, the remainder of this decision refers only to the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that he or she is not currently engaged in "substantial gainful activity" at the time her or she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits the claimant's physical or mental ability to do basic work activities.  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id*. (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id*. (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

**V. THE ALJ'S FINDINGS**.

14

Upon consideration of the entire record, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Act through September 20, 2007. Plaintiff had not engaged in substantial gainful activity since January 31, 2007, the alleged onset date of her impairment.

2. Plaintiff had the following severe impairments:  bipolar disorder and post traumatic stress disorder.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3. From the onset date of January 31, 2007 through May 1, 2009, Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:
   a. She was able to perform both simple and detailed instructions on a constant basis.
   b. She was able to perform complex instructions on only a rare basis.
   c. She could sustain concentration, persistence and pace for two-hour periods of time with normal breaks.
   d. She was precluded from having contact with the general public.
   e. There were no limitations on her ability to interact with co-workers and supervisors.
   f. She could adapt to simple, routine changes in the work environment.

4. At the close of the hearing, Plaintiff's counsel suggested a more reasonable onset date of May 1, 2009 with continuing disability review in one year.  Although it was unclear whether Plaintiff formally agreed to amend the alleged onset date, the medical records do begin in earnest around that time.  Accordingly, the ALJ found that from May 1, 2009 through the date of the decision, Plaintiff had the residual functional capacity for the performance of a full range of work at all exertional levels but with the following non-exertional limitations:
   a. She was able to perform both simple and detailed instructions on a constant basis.
   b. She was able to perform complex instructions on only a rare basis.
   c. She could sustain concentration, persistence and pace for two hours with normal breaks.
   d. She was precluded from having contact with the general public.
   e. She was limited to only occasional contact with co-workers and supervisors.
   f. She can adapt to simple, routine changes in her work environment.
   g. She was precluded from jobs that have production and pace requirements.

5. Plaintiff had no past relevant work.  Considering Plaintiff's age, limited education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

6. Plaintiff had not been under a disability as defined in the Act from January 31, 2007 through the date of the decision on October 25, 2010.

(Docket No. 11, pp. 67-79 of 442).

## VI. STANDARD OF REVIEW.

Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the

16

Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

**VII. DISCUSSION**.

Plaintiff argues that:

1.    The ALJ did not employ the proper legal criteria in finding that Plaintiff does not have an impairment that meets or medically equals one of the listed impairments.
2.    The ALJ did not properly evaluate the psychological examiners' opinions.
3.    The ALJ failed to properly consider Plaintiff's obesity.

Defendant responded:

1.    There is substantial evidence supporting the ALJ's step three finding.
2.    The  ALJ balanced competing medical opinions in accordance with controlling regulations.
3.    The ALJ properly considered Plaintiff's obesity throughout the sequential process.

**1.    THE ALJ'S STEP THREE DETERMINATION.**

Plaintiff alleges that the ALJ conducted a cursory analysis of her mental impairments and even compared them to the listed impairments.  It is her contention that the ALJ gave absolutely no indication of how she arrived at her Step Three finding or whether she analyzed it pursuant to relevant rules, regulations, and case law.  In particular, there is no consideration of Dr. Comley's finding that Plaintiff had marked limitations.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings.  *Todd v. Astrue*, 2012 WL 2576435, *9 (N.D.Ohio,2012) (*citing Reynolds v. Commissioner of Social Security*, 424 F. App'x 411, 414 (6th Cir. 2011) (*citing* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when

17

considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment. *Id.* (*citing Reynolds*, 424 F. App'x at 415; *Hunter v. Astrue*, No. 1:09–CV–2790, 2011 WL 6440762, at *3 (N.D.Ohio,2011); *May v. Astrue*, No. 4:10–CV–1533, 2011 WL 3490186, at *8–9 (N.D.Ohio,2011)). The regulations "do[ ] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue," and there is no heightened articulation standard at step three when the ALJ's findings are supported by substantial evidence. *Id.* (*citing Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir.2006)). Nevertheless, it is the claimant's burden to show that he or she meets or medically equals an impairment in the Listings. *Id.* (*citing Evans v. Secretary of Health & Human Services*, 820 F.2d 161, 164 (6th Cir.1987) (per curiam)).

Here, it is not impossible to conduct meaningful judicial review of the ALJ's findings at step three of the sequential evaluation. The ALJ's decision reflected rigorous scrutiny of the requirements, first acknowledging the standard at step three and determining that Plaintiff had severe medically determinable impairments, namely bipolar disorder and PTSD (Docket No. 11, pp. 69-71 of 442). In addition to her broad assertions that she met 12.04 of the Listing, Plaintiff identified the findings of Dr. Comley as medical evidence that would substantiate the "B" criteria of Listing 12.04. However, Plaintiff failed to identify specific medical evidence demonstrating that she meets or medically equals *all* of the criteria of Listing 12.04[2]. The listing provides that an affective disorder

---

[2]

The required level of severity for A to be satisfied is as follows:

A.     Medically documented persistence, either continuous or intermittent, of one of the following:
    1.     Depressive syndrome characterized by at least four of the following:
        a.     Anhedonia or pervasive loss of interest in almost all activities; or
        b.     Appetite disturbance with change in weight; or
        c.     Sleep disturbance; or
        d.     Psychomotor agitation or retardation; or
        e.     Decreased energy; or
        f.     Feelings of guilt or worthlessness; or
        g.     Difficulty concentrating or thinking; or

is "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2010).  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.  *Id.*

     To be presumed disabled under Listing 12.04, a plaintiff must demonstrate that his or her mental impairments satisfy both the A and B criteria of the Listing or that the requirements of the "C" criteria are fulfilled.  Paragraph A requires plaintiff to establish medically documented persistence, either continuous or intermittent, of either depressive syndrome characterized by at least four out of nine listed symptoms; manic syndrome characterized by at least three out of eight listed symptoms;

---

|     |     | h. | Thoughts of suicide; or |
|     |     | i. | Hallucinations, delusions, or paranoid thinking; or |
|     | 2. | | Manic syndrome characterized by at least three of the following: |
|     |     | a. | Hyperactivity; or |
|     |     | b. | Pressure of speech; or |
|     |     | c. | Flight of ideas; or |
|     |     | d. | Inflated self-esteem; or |
|     |     | e. | Decreased need for sleep; or |
|     |     | f. | Easy distractibility; or |
|     |     | g. | Involvement in activities that have a high probability of painful consequences which are not recognized; or |
|     |     | h. | Hallucinations, delusions or paranoid thinking; or |
|     | 3. | | Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); AND |
| B. | | | Resulting in at least two of the following: |
|     | 1. | | Marked restriction of activities of daily living; or |
|     | 2. | | Marked difficulties in maintaining social functioning; or |
|     | 3. | | Marked difficulties in maintaining concentration, persistence, or pace; or |
|     | 4. | | Repeated episodes of decompensation, each of extended duration; or |
| C. | | | Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: |
|     | 1. | | Repeated episodes of decompensation, each of extended duration; or |
|     | 2. | | A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or |
|     | 3. | | Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. |

20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2013).

or bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes). *Id.*

In the instant case Plaintiff did not satisfy any of the medically documented symptoms required to show depressive syndrome or manic syndrome. At most, Plaintiff had three of the nine listed "A" symptoms–occasional thoughts of suicide, hallucinations and occasional sleep disturbance. Similarly, there is no evidence that Plaintiff satisfied the "B" criteria. Under the most favorable analysis, there is only documented evidence that Plaintiff had suffered from hallucinations and delusions. Although Plaintiff was diagnosed with a bipolar disorder, there was little evidence of the excitability, erratic and impulsive behaviors that generally accompany mania. Plaintiff could not satisfy the threshold definition of a bipolar syndrome because it consists of both manic and depressive syndromes. Neither is there a medically documented history of a chronic affective disorder of at least two years duration that caused more than a minimal limitation of the ability to do basic work activities, a requirement of the "C" criteria.

The salient point in the ALJ's analysis is that even if Plaintiff had two marked restrictions under the "B" criteria or a history of a chronic affective disorder defined in the "C" criteria, there is an absence of evidence provided by Plaintiff that she has a medically determinable impairment of the severity designated by the "A" criteria. There is every indication that the ALJ followed agency rules and regulations and was quite critical in analyzing whether Plaintiff met 12.04 of the Listing (Docket No. 11, pp. 70-71 of 442).

The ALJ's decision that Plaintiff's impairments fail to satisfy the requirements of Listing 12.04 is supported by substantial medical evidence. Therefore, this Court must defer to the ALJ's finding.        **2.    THE PSYCHOLOGICAL IMPAIRMENTS.**

Plaintiff argues that the ALJ's analysis of Plaintiff's psychological impairment is flawed due to factual inaccuracies and improper analysis of Drs. Comley opinions, improper description of the sexual trauma reported to Dr. Dallara and the evidence of psychoses reported to Dr. Reddy.

### A.    DR. COMLEY.

At the request of the Job and Family Services, Dr. Comley conducted a consultative examination on August 27, 2009.  Based on that examination alone, Dr. Comley subsequently completed a mental functional capacity assessment.  Plaintiff's claim is that the ALJ improperly rejected Dr. Comley's opinions.

The Social Security regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.  *Gayheart v. Commissioner of Social Security*, 2013 WL 896255 (6th Cir. 2013) (*citing* SSR 96–6p, 1996 WL 374180, at *2 (July 2, 1996)).  An opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source").  *Id.* (*citing* 20 C. F. R. §§ 404.1502, 404.1527(c)(1)).  An opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), *Id.* (*citing* 20 C. F. R. §§ 404.1502, 404.1527(c)(2)).  A non-treating, but examining source will simply get more weight than that opinion of a source who has not examined the claimant.  20 C.F.R. § 404.1527(d)(1) (Thomson Reuters 2013).

When an ALJ considers the findings of a psychological consultant, the ALJ must evaluate the findings using relevant factors, such as the psychologist's medical speciality and expertise in the SSA's rules, the supporting evidence in the record, supporting explanations provided by the

psychologist, and any factors relevant to weighing of the opinions.  20 C. F. R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii) (Thomson Reuters 2013).  Unless the treating source's opinion is given controlling weight, the ALJ must explain in the decision the weight given to the opinions of a state agency psychological consultant just as he or she does for any opinions from treating sources who do not work.  20 C. F. R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii) (Thomson Reuters 2013).

As an initial matter, the ALJ's explanation for giving Dr. Comley's opinions little weight is well reasoned and reflects the rigorous scrutiny applied to the opinions called for by 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ gave some weight to each of the consultive examiners, Drs. Comley and Dallara, to the extent that each was consistent and supportive of the other.  The ALJ also acknowledged equivalent inconsistencies between the opinions of Drs. Comley and Dallara, properly balancing the stark contrast that resulted even though the decisions were only separated by two days. The ALJ determined that the Dr. Comley's conclusions were based in large part on Plaintiff's subjective complaints.  The ALJ cautiously scrutinized Dr. Comley's reports which tended to give Plaintiff's allegations full credit even though he admitted that she was manipulative and the results from some diagnostic tests showed that Plaintiff was prone to exaggeration.  The GAF attributed to Plaintiff during their encounter did not translate into an automatic finding of disability or preclude work.  There is every indication that the ALJ applied the factors set out in Sections 404.1527(c), 416.927(c) when weighing Dr. Comley's opinions.

The ALJ's decision shows that she considered relevant factors in determining what credit to give Dr. Comley's opinions.  Having weighed Dr. Comley's opinions as the regulations prescribe, the ALJ's decision to place little weight on the conclusions therefrom, is supported by substantial evidence.

22

B.    **DR. DALLARA.**

Plaintiff claims that the ALJ erred in noting that her description of significant sexual trauma was never reported to Dr. Dallara.  What the ALJ actually stated was that there is no evidence that she admitted to Dr. Dallara having an abortion with a clothes hanger (Docket No. 11, p. 76 of 442).  This finding is supported by Dr. Dallara's report.  He clearly did not include this fact in his evaluation (Docket No. 11, pp. 279-280 of 442).

Likewise, the ALJ did not disregard  the visions of "people in the walls" or "dancing tomatoes" reported to Dr. Dallara.  The ALJ gave considerable weight to the opinions of Dr. Dallara, specifically, his decision that Plaintiff had visions of "people in the walls" or "dancing tomatoes" when she was attempting to sleep.  Dr. Dallara noted that there were no signs of radical change in personality, impaired functioning or a distorted sense of objective reality during the examination.  The ALJ adopted this finding (Docket No. 11, 76 of 442).

C.    **DR. REDDY.**

Plaintiff claims that the ALJ failed to consider any of the evidence that she had auditory hallucinations as reported to Dr. Reddy or that she had visual hallucinations as reported to Dr. Dallara. Plaintiff contends further that had the ALJ had considered this evidence, a finding of psychoses would have resulted.

The ALJ did not disregard the opinions of Dr. Reddy, who reported that Plaintiff heard voices (Docket No. 11, p. 73 of 442).  Considerable weight was given to Dr. Reddy's observations and treatment which during the examination, Plaintiff showed no signs of radical change in personality, impaired functioning or a distorted sense of objective reality (Docket No. 11, pp. 73-74 of 442).

**3.**    **OBESITY**

23

Plaintiff claims that the ALJ erred by failing to properly evaluate her obesity and the impact

on her ability to work.  Citing SOCIAL SECURITY RULING (SSR) 02-1p, EVALUATION OF OBESITY,

2000 WL 628049 (Sept. 12, 2002), Plaintiff argues that this ruling directs the ALJ to assess the impact

of obesity on her residual functional capacity and the ultimate determination of disability.

The Social Security Administration's policy and protocol on the evaluation of obesity is

explained at SSR 02-1p, a policy statement that reinforces the Regulations' mandate regarding obesity,

in pertinent part, as follows:

> Obesity is a risk factor that increases an individual's chances of developing
> impairments in most body systems.  *Cogar v. Astrue,* 2012 WL 2130974, *3
> (N.D.Ohio,2012) (*citing* SSR 02-1p at *3).  It commonly leads to, and often
> complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal
> body systems.  *Id.*  Obesity increases the risk of developing impairments such as type
> II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease;
> hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels
> of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea.  *Id.*  It is
> associated with endometrial, breast, prostate, and colon cancers, and other physical
> impairments.  *Id.*  Obesity may also cause or contribute to mental impairments such
> as depression.  *Id.*  The effects of obesity may be subtle, such as the loss of mental
> clarity or slowed reactions that may result from obesity-related sleep apnea.  *Id.*

SSR 02-1p further recognizes that the claimant's obesity could affect her or his exertional

limitation and must be considered at steps four and five as follows:

> Obesity can cause limitations of function.  *Id.*  The functions likely to be limited
> depend on many factors, including where the excess weight is carried.  *Id.*  An
> individual may have limitations in any of the external functions such as sitting,
> standing, walking, lifting, carrying, pushing, and pulling.  *Id.*  It may also affect ability
> to do postural functions, such as climbing, balance, stooping, and crouching.  *Id.*  The
> ability to manipulate may be affected by the presence of adipose (fatty) tissue in the
> hands and fingers.  *Id.*  The ability to tolerate extreme heat, humidity, or hazards may
> also be affected.  *Id.*

The Sixth Circuit has explained that SSR does not mandate a particular mode of analysis,

rather it directs an ALJ to consider the claimant's obesity, in combination with other impairments, at

24

all stages of the sequential evaluation. *Sleight v. Commissioner of Social Security*, 2012 WL 1986427,

*7 (E.D.Mich.,2012) (*citing Nejat v. Commissioner of Social Security*, 359 Fed.Appx. 574, 577 (6th

Cir.2009) (*quoting Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411–412 (6th Cir.2006)).

> . . . we will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

> *Id.* at *8.

Here, the problem with Plaintiff's argument that the ALJ erred in not considering obesity is

that SSR 02-1p does not prescribe a specific procedure for evaluation and the Magistrate is persuaded

that the ALJ was not required to make assumptions about the severity or functional effects of obesity

based on mere allegations and speculation about obesity.  In contrast to the decisions made by this

Magistrate Judge in *Riley v. Astrue*[3] and Magistrate Judge Greg White in *Cogar v. Astrue*[4], there are

five reasons that the ALJ was not required to consider the possibility of coexisting and related

conditions which would establish that Plaintiff's obesity was medically equal to an impairment or was

of the severity to create an abnormality.

First, Plaintiff never articulated that she was obese implicitly in her report of symptoms or

---

[3]

This case is distinguished from *Riley* for the reasons that (1) the ALJ completely overlooked obesity even though the medical records included height and weight, BMI and references to plaintiff being overweight over a period of time; (2) there were specific references to the combined effect of obesity; and (3) the ALJ failed to make even the attenuated, vicarious or constructive reference to the obesity issue.

[4]

During the relevant time period, the record reflected weight and BMI and the ALJ mentioned obesity in the summary of medical evidence and in calculating residual functional capacity.  In fact, the ALJ found that Cogar established medically determinable, severe impairments due to *inter alia,* depression and **obesity**.  The ALJ analysis was inconsistent in that he found Cogar to have a severe impairment of depression based upon her moderate difficulties in concentration, but then concluded her mental impairment was "only barely severe" with little analysis.  The case was remanded because the court was unable to trace the path of the ALJ's reasoning as to whether his underlying analysis was insufficient under Administration's procedural rules.  The remand to consider Plaintiff's obesity in combination with depression was made incidental to the failure to consider the ALJ's failure to follow the procedural rules.

25

diagnoses on which a disability determination should be made and she did not make an argument for a finding of disability based on obesity during the administrative hearing.

Second, the ALJ acknowledged that Dr. Reddy remarked that Plaintiff was obese when conducting an initial psychological examination (Docket No. 11, pp. 74, 271 of 442).  The ALJ made an indirect reference to Plaintiff's obesity but could not factor it directly into the decision because Dr. Reddy did not account for Plaintiff's obesity in his evaluation or diagnoses.

Third, Dr. Angerman commented about the difficulty conducting a "bimanual" examination because of Plaintiff's obesity and discussed diet and exercise as a method of managing her breathing (Docket No. 11, pp. 245, 405 of 442).  Dr. Markowski observed that Plaintiff was obese when treating her for abdominal pain (Docket No. 11, p. 240 of 442).  Neither Drs. Angerman nor Markowski identified obesity as a medically determinable impairment or measured Plaintiff's weight and body mass over a period of time.

Third, neither Drs. Angerman, Markowski nor Reddy evaluated whether Plaintiff's specific level of weight, standing alone, was interrelated with a severe impairment or whether Plaintiff's specific level of weight or the accumulation of body fat had an impact on her functional or exertional limitations.

Fourth, Plaintiff failed to establish medically determinable, severe impairments that could be complicated by obesity.

Fifth, apparently the alleged excess weight was not obvious or so pronounced at the administrative hearing that the ALJ could have reasonably appreciated its effect on Plaintiff's mental impairments.

It is a mischaracterization of the Rule to suggest that the ALJ is obligated to consider obesity

26

in every case.  SSR 02-1p explains when obesity should be given emphasis and that is when in combination with other impairments, obesity **may** increase the severity of the impairment.  The ALJ's opinion contains a reference to Plaintiff's weight even though Plaintiff failed to marshal competent medical evidence to show specifically that her weight and body mass index were well documented throughout her treatment records.  Despite the occasional references to Plaintiff's appearance of obesity, there are no express articulations that ratify the diagnoses.  Given the absence of evidence that Plaintiff's obesity increased the severity of her other impairments, the Magistrate finds that obesity was not a medically determinable factor to be considered in formulating the five-step sequential evaluation.

### VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed and the certificate of appealability denied.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:  April 5, 2013